**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KENNETH BECK,
          *Plaintiff-Appellant,*

                    v.

CITY OF UPLAND; CITY OF UPLAND
POLICE DEPARTMENT; MARTIN
THOUVENELL, City of Upland
Police Chief; JEFF MENDENHALL,          No. 05-56901
Upland Police Officer; MICHAEL          D.C. No.
OLLIS,                                  CV-05-00184-ABC
          *Defendants-Appellees,*          OPINION
                    and

INTRAVAIA ROCK AND SAND
CORPORATION; RON WILLEMSEN; LEE
JACKSON,
                    *Defendants.*

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, District Judge, Presiding

Argued and Submitted
August 10, 2007—Pasadena, California

Filed May 28, 2008

Before: Marsha S. Berzon and Sandra S. Ikuta,
Circuit Judges, and James K. Singleton,* District Judge.

*The Honorable James K. Singleton, Senior United States District
Judge for the District of Alaska, sitting by designation.

6035

Opinion by Judge Berzon;
Partial Concurrence and Partial Dissent by Judge Ikuta

COUNSEL

Thomas R. Freeman (argued), Bird, Marella, Boxer, Wolpert, Nessim, Drooks, & Lincenberg, P.C., Los Angeles, California, and Stephan J. Johnson, Reiss & Johnson, Rancho Cucamonga, California, for the plaintiff-appellant.

Samuel J. Wells (argued), Samuel J. Wells, APC, Los Angeles, California, and William K. Hanagami, King & Hanagami, ALC, Los Angeles, California, for the defendants-appellees.

OPINION

BERZON, Circuit Judge:

Kenneth Beck and the City of Upland, California, engaged for months in an escalating series of disputes arising from Beck's protests against a city contract granted to one of his competitors. In the incident that gave rise to this case, Beck was arrested six days after he confronted two city police officers over what he felt to be unfair treatment by the city. Beck's arrest was pursuant to a warrant for two felony violations of a California statute prohibiting threats of violence made to deter police officers from performing their duties. The warrant, we conclude — as did the state courts considering the criminal charges — was entirely without probable cause. All charges against Beck were dismissed.

Beck maintains that his "First and Fourth Amendment rights . . . were violated when he was arrested and imprisoned [without probable cause] for his protected speech and then forced to incur the cost of defending himself against the crim-

inal charges." The question we consider is whether Beck's subsequent suit under 42 U.S.C. § 1983 for these constitutional violations and for various state law causes of action against the City of Upland, its police department, and the officers who engineered his arrest, Police Chief Martin Thouvenell and Sergeant Jeff Mendenhall, may go forward to trial. The district court held that it may not, because (1) a San Bernardino County prosecutor authorized the filing of a criminal complaint before the police officers obtained an arrest warrant, thereby acting as an intervening cause of Beck's injuries and cutting off post-complaint liability under § 1983; and (2) California state law immunized the officers. *See Smiddy v. Varney*, 665 F.2d 261, 266-68 ("*Smiddy I*") (9th Cir. 1981) (discussing the post-complaint liability of the arresting officers in such circumstances); CAL. CIV. CODE § 43.55(a) (state law immunity).

After the district court decision, the United States Supreme Court decided *Hartman v. Moore*, 547 U.S. 250 (2006), clarifying the elements of a constitutional tort under § 1983 for retaliatory arrest or prosecution. We hold, relying in part on *Hartman*, that causation issues arising from the criminal complaint do not preclude Beck's case, and that California immunity law does not either. We therefore reverse the district court's grant of summary judgment against Beck.

## I. Background

### A. The Rubble Removal Contract and the Zoning Investigation

Early in 2003, Beck heard about a business opportunity from city officials: Upland was planning construction work in town, and there would be a significant amount of rubble to remove and recycle.[1] Beck thought his business, Dineen

---

[1]Because we are reviewing a grant of summary judgment against Beck, we relate the facts in the light most favorable to him, the nonmoving party. *Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007). The defendants dispute many of these facts in opposing declarations and depositions.

Trucking, was a good fit for the job: It had been operating in town since 1958 and often did rubble removal and recycling work. Beck believed the rubble had significant resale value and would have been willing to remove it for free in exchange for the right to resell it. So Beck was surprised when, on September 8, 2003, the City Council awarded a $350,000 no-bid contract, without public notice or comment, to an out-of-town competitor, Intravaia Rock & Sand. Because the city normally put all projects over $5,000 out to bid, Beck suspected that there were irregularities in the contracting process.

Acting on his belief, Beck called the mayor of Upland the next day and told him that he planned to raise his concerns about the contract at the next city council meeting, on September 22, 2003. On the 22nd, Ron Willemsen, president of Intravaia, visited Beck and confronted him about the contract. Soon after Willemsen's visit, the mayor called Beck and asked him not to speak publicly about the contract. That night, instead of speaking at the city council meeting, Beck met with Willemsen, Chief Thouvenell, and the city public works director and was advised to work out a deal with Willemsen to share the contract. As it turned out, the two were not able to agree, and no deal was reached.

Instead, Beck took his grievances to the city manager, Michael Milhiser, this time successfully. In early October, the city backed out of the Intravaia contract. At about the same time, Willemsen again came to Beck's office and promised to have "every agency down on top of [him]" because of his efforts to block Willemsen's contract.

On November 24, 2003, a zoning complaint letter arrived at Upland city hall, sent by a law firm that represented Intravaia. The letter suggested that rubble piles on Beck's land, which he maintained as part of his business and which included rubble resulting from an earlier city project, were out of compliance with zoning changes that had occurred in 2000. The rubble piles had been there since at least the early 1990s,

but Beck had not previously been informed of any zoning problems. Police officer Michael Ollis was assigned to investigate the complaint.

The decision to investigate was unusual. At the city council meeting at which the 2000 zoning changes were adopted, business owners had raised concerns over enforcement against existing nonconforming businesses in Beck's part of the city and were assured that their existing uses of their properties were not threatened. Upland's senior planner had indicated that she was "not aware of one single incidence [sic] where the City ha[d] enforced" against a nonconforming use existing at the time a new zoning ordinance was passed; such uses had "all been allowed to continue, as long as they continue." Also, the city's Director of Community Planning confirmed at that meeting that the city's policy was to enforce zoning ordinances only against new property uses.

Ollis and Sergeant Mendenhall, along with the city engineer, arrived at Dineen Trucking to serve Beck with a notice of zoning violations signed by Chief Thouvenell on January 27, 2004. Beck had not previously known of the investigation, and the ensuing discussion was heated. Beck believed the investigation to be retaliatory, and summarily ended the meeting by ordering the three city officials to leave his property.

## B.   The Confrontation

The next week, Beck and his wife Brenda Beck went to a party celebrating the opening of a local bank. As they were leaving the event, Beck saw Chief Thouvenell and Sergeant Mendenhall standing by the buffet. Beck "decided it was the right time to go over there" and talk to Thouvenell about the way the city was treating him.

After saying hello, Beck bluntly told Thouvenell to get "Ollis off my ass." In the course of the brief ensuing discussion, Thouvenell at one point retorted, "Ken, we should have

taken care of you a long time ago," to which Beck responded "You don't know who you're dealing with."[2] The conversation ended there, and both the Becks and the officers left the function.

Both Chief Thouvenell and Sergeant Mendenhall later declared that they believed Beck was threatening their "position or employment" as police officers. Neither ever indicated any belief that Beck had threatened them with violence.

The day after the incident at the bank opening, the Upland Chamber of Commerce held a meeting triggered in part by the zoning investigation of Beck's business. Chief Thouvenell, Sergeant Mendenhall, and the city manager, Milhiser, attended the meeting. They were quite exercised over Beck's statements of the night before. Milhiser, for example, maintained that Beck had "been way out of line and very offensive," and said that Thouvenell had "exercised a lot of restraint in not . . . hooking up [Beck] that night." And Thouvenell told the Chamber to "back off from this whole [Beck] issue, leave it alone, stay out of their way," and warned the Chamber members that he would "make contact with the attorney general's office" if they persisted in their "interference."

## C.   The Police Report and the Complaint

Even before the Chamber meeting, Sergeant Mendenhall and Chief Thouvenell were preparing to take action against Beck. Immediately after the confrontation at the bank, Men-

---

[2]The police recalled the comment differently, asserting that Beck used profanity, saying "You better back the fuck off me because you don't know who you're fucking with." The police also assert that Beck, after making the comment to Chief Thouvenell, repeated it to Sergeant Mendenhall. Beck's use of obscenity is not material to our legal analysis; even if it were, we would have to assume on summary judgment that he did not swear and that he spoke only to Chief Thouvenell. *See Blankenhorn*, 485 F.3d at 470.

denhall told Thouvenell that he believed Beck had violated a criminal law against threatening police officers. Thouvenell told him to look into the matter.

Mendenhall did so and prepared a police report on the incident. Thouvenell then indicated that Mendenhall should present the report to the District Attorney's office, which he did on February 9, 2004. The report describes Mendenhall's impressions of the conversation with Beck at the bank opening party and contains statements from other witnesses. The report does not contain Thouvenell's statement to Beck.

Sergeant Mendenhall also submitted a form to the District Attorney providing basic information on Beck and the witnesses. At the top of the form, under "crime/incident," Mendenhall wrote "PC 69 Threatening an Officer." California Penal Code § 69 criminalizes, in pertinent part, "attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law." The offense may be charged either as a felony or as a misdemeanor. Mendenhall circled "Felony" rather than "Misdemeanor" on the form.

Deputy District Attorney Joseph Gaetano reviewed the police report. He conducted no additional investigation, factual or legal, and later stated he "suppose[s]" he generated a criminal complaint on his computer. The program he uses to do so allows him simply to click a box to format the complaint and to select the charge; all other case-specific information is typed in by a clerk. He had the complaint, charging Beck with two counts of felony violation of § 69, ready for Mendenhall to sign that day.

In a deposition concerning his decision, Gaetano testified that Mendenhall did not tell him to prosecute Beck's alleged crime as a felony and did not tell him to prosecute Beck as a favor to the police department. Gaetano asserted work-product privilege, however, when asked whether his decision

to charge Beck with a felony had been "swayed" by the fact that "felony" was circled on the police report, and again when asked if he felt "any pressure . . . to file charges against Mr. Beck."

A superior court judge issued a warrant for Beck's arrest shortly thereafter, after receiving the complaint and a declaration by Sergeant Mendenhall in support of the warrant. The judge received no document signed by Gaetano before he issued the warrant.

## D.   The Arrest and Subsequent Judicial Proceedings

Two days after the warrant issued, three officers, each in his or her own vehicle, pulled up in front of Dineen Trucking. Beck was at his desk. Wearing bulletproof vests and with weapons unharnessed, the officers entered Beck's office, arrested him, and handcuffed him. The officers took the handcuffed Beck outside and waited with him at the front of his business. Sergeant Mendenhall had arrived but remained off the property, watching the arrest from his car. After half an hour, another police car arrived to take Beck to the police station and then to jail. Beck spent five hours in jail before he posted bail, which was set at $15,000.

At Beck's preliminary hearing the judge described himself as "troubled by this case on many levels, not the least of which is that it's been filed as a felony." Regarding the standard of proof in a preliminary hearing as minimal, the judge allowed the case to go forward but urged the defense to "challenge the Court's ruling via 995." California Penal Code § 995 allows a court to set aside an indictment or information for, among other things, lack of probable cause.

Beck's lawyer did file a § 995 motion, and a second judge set aside the charges. Citing *People v. Superior Court of San Francisco (Anderson)*, 151 Cal. App. 3d 893 (Ct. App.1984), which requires a threat of violence to support a "threat" viola-

tion of § 69, the judge held that "obviously, [Beck's] statement does not contain any element of violence that I can find," and that there was "no indication of any immediate threat of physical violence whatsoever." He dismissed the criminal case against Beck. A few months later, Upland voluntarily dismissed the zoning charges against Beck as well.[3]

### E.   The Litigation

Beck then brought this case. In addition to the federal § 1983 cause of action, Beck alleged eight causes of action under state law. The § 1983 allegations here at issue were that Beck was "falsely arrested, unlawfully detained, and falsely imprisoned" in violation of his Fourth Amendment rights and that the "arrest was perpetrated . . . in retaliation for [Beck's] exercise of his First Amendment rights against Defendant, Martin Thouvenell, as well as [for] 'whistle blowing' " on the Intravaia contract.[4] Of Beck's state law causes of action, the second (negligence), third (assault and battery), fourth (false imprisonment), and fifth (intentional infliction of emotional distress) are the subject of this appeal. Beck sought damages for the costs he incurred in defending himself, and also sought punitive and compensatory damages, attorneys' fees, and costs.

The officers claimed qualified immunity, arguing that, on all the federal constitutional causes of action, *Smiddy I* immunized them from liability for harm suffered after the complaint was filed, and also asserted state law statutory immunity. On November 14, 2005, the district court granted summary judgment against Beck on his § 1983 causes of

---

[3]Upland did, however, send Beck another notice of zoning violations in December, 2004. As of October 27, 2005, no action had been taken on this new notice.

[4]Beck's complaint alleges violations of other rights, but on appeal he pursues only the Fourth and First Amendment violations arising from his arrest, so we consider only those issues.

action, holding that, under *Smiddy I*, Gaetano's decision to prepare the complaint was an independent and intervening cause that immunized the Upland defendants "from liability for any damages suffered by [Beck] as a result of his subsequent arrest and detention." The court further held that, even if Beck could overcome *Smiddy I*, his statements at the party provided probable cause to support the warrant. Finally, the court held Beck's state law causes of action precluded by California statutory immunity.[5]

This timely appeal followed.

## II. Analysis

### A. Standard of Review and Analytic Framework

We review a grant of summary judgment de novo, making all justifiable factual inferences in favor of the nonmoving party. *Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007). "If a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *Id.* (alteration omitted).

Our analysis of the qualified immunity defense in a suit under § 1983 follows the familiar two-step framework of *Saucier v. Katz*, 533 U.S. 194 (2001), asking first whether the officers' conduct violated a federal right and, second, whether the right was clearly established at the time. *See Blankenhorn*, 485 F.3d at 470-71; *see also Malley v. Briggs*, 475 U.S. 335, 337, 344-46 (1986) (applying the qualified immunity standard in a false arrest case); *Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1376-78 (9th Cir. 1990) (applying the standard in a First Amendment retaliatory arrest case).[6] In this instance,

---

[5]The court granted summary judgment in favor of Ollis because he was not involved in the events surrounding the complaint and arrest. Beck does not appeal that decision.

[6]The officers argue that we may not consider *Malley* or other cases not discussed in the district court. They are wrong. "[A]ppellate review of

however, the officers, relying on *Smiddy I*, maintain that they cannot be held liable for violating Beck's First or Fourth Amendment rights by arresting him, because an independent prosecutor authorized prosecution before the officers sought and obtained an arrest warrant.[7]

We disagree. We hold that, on the summary judgment record, Beck has shown, with regard to either of the asserted constitutional violations, that the prosecutor's actions were not an intervening cause shielding the officers from liability, albeit for different reasons; that the officers lack qualified immunity; and that the officers may not avail themselves of the California statutory immunity they assert.

## B. The Presumption of Prosecutorial Independence and the Causation Problem

[1] A prosecutor's independent judgment may break the chain of causation between the unconstitutional actions of other officials and the harm suffered by a constitutional tort plaintiff. *See Hartman*, 547 U.S. 250, 262-63 (2006) (discussing the issue in the First Amendment context)*; Smiddy I*, 665 F.2d at 266-68 (discussing the issue in the Fourth Amendment context). Put in traditional tort terms, the prosecutor's inde-

---

qualified immunity dispositions is to be conducted in light of all relevant precedents, not simply those cited to, or discovered by, the district court." *Elder v. Holloway*, 510 U.S. 510, 512 (1994).

[7]Beck was arrested and imprisoned after the criminal complaint was filed. His "false arrest" cause of action might thus be better styled as one for malicious prosecution. *See Blaxland v. Commonwealth Dir. of Pub. Prosecutions*, 323 F.3d 1198, 1204-06 (9th Cir. 2003) (distinguishing between the two torts at common law). The *Smiddy I* presumption has, however, been applied in both false arrest and malicious prosecution cases. *See, e.g.*, *Borunda v. Richmond*, 885 F.2d 1384, 1386-87, 1390 (9th Cir. 1988) (false arrest); *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004) (malicious prosecution); *see also id.* at 1069 (referring to Fourth Amendment malicious prosecution suits). As the distinction makes no analytic difference here, we use Beck's terms.

pendent decision can be a superseding or intervening cause of a constitutional tort plaintiff's injury, precluding suit against the officials who made an arrest or procured a prosecution. *See* RESTATEMENT (SECOND) OF TORTS §§ 440 *et seq.* (discussing causation problems in tort cases).

The method we have prescribed for addressing this causation question in Fourth Amendment-based suits differs somewhat from the method the Supreme Court recently set out in the context of First Amendment retaliatory prosecution suits.[8] We first discuss both methods in some detail before explaining how they apply to Beck's appeal.

We first consider our Fourth Amendment causation law, in which we have used a rebuttable-presumption-based approach. In *Smiddy I*, a § 1983 false arrest case, we adopted an evidentiary presumption, *see Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002), "that the prosecutor filing [a criminal] complaint exercised independent judgment in determining that probable cause for an accused's arrest exist[ed]," thereby breaking the "chain of causation between an arrest and prosecution" and immunizing "investigating officers . . . from damages suffered" after the complaint was filed. *Smiddy I*, 665 F.2d at 266-67; *see also Smiddy v. Varney*, 803 F.2d 1469, 1472 ("*Smiddy II*") (9th Cir. 1986) (discussing the presumption). The *Smiddy I* presumption may be rebutted if the plaintiff shows that the independence of the prosecutor's judgment has been compromised. *Smiddy I*, 665 F.2d at 266-67.

---

[8]Prior to *Hartman*, we sometimes applied *Smiddy I* in the First Amendment retaliatory prosecution context. *See Nadell v. Las Vegas Metro. Police Dep't*, 268 F.3d 924, 929 (9th Cir. 2001). Such application is no longer proper, as the Supreme Court set out a clearly conflicting approach to resolving First Amendment causation issues in *Hartman*. *See Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc). For this reason, we refer to *Smiddy I* as concerning Fourth Amendment causation.

*Smiddy I* provided examples of circumstances in which the presumption of independent judgment will be considered rebutted, emphasizing that "[t]hese examples are not intended to be exclusive." *Id.* at 267. The enunciated circumstances, elaborated upon in later cases, include situations in which the prosecutor was pressured by police or was given false information, *id.* at 266-67; the police "act[ed] maliciously or with reckless disregard for the rights of an arrested person," *id.* at 267; the prosecutor "relied on the police investigation and arrest when he filed the complaint instead of making an independent judgment on the existence of probable cause for the arrest," *id.*[9]; or the officers "otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings," *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004). Once "the plaintiff has introduced evidence to rebut the presumption, the burden remains on the defendant to prove that an independent intervening cause cuts off his tort liability." *Smiddy I*, 665 F.2d at 267. Critically for this case, "[i]f for reasons of privilege or otherwise the relevant evidence [to challenge the presumption] is not available, no presumption will arise," *id.* at 267-68, and the defendant has the burden to show that the prosecutor's judgment was independent.[10]

Having described our approach in Fourth Amendment arrest cases where a prosecutor's actions have intervened, we turn to the Supreme Court's recent resolution of the similar causation issues arising from prosecutorial actions in First Amendment retaliatory prosecution cases. The Court set out its approach in *Hartman*, published, as we have noted, after

---

[9]We have since held that a plaintiff must present information in addition to his own account that contradicts the police report to avail himself of this showing. *See Newman v. County of Orange*, 457 F.3d 991, 994-95 (9th Cir. 2006).

[10]As we discuss below, even when privilege has been invoked, the plaintiff in such cases always has the initial burden of showing that probable cause for the arrest or prosecution was absent.

the district court decision in this case. *See* 547 U.S. at 262-66 (discussing the causation problem).[11] *Hartman* addressed an allegedly retaliatory prosecution in which the plaintiff contended that postal inspectors retaliated against his constitutionally protected speech by procuring his prosecution. *Id.* at 252-255. The plaintiff sought to hold the inspectors liable for the prosecution. *Id.* The Court noted that the prosecutor's presence in the causal chain meant that "the requisite causation between the defendant[ ] [official's] retaliatory animus and the plaintiff's injury is usually more complex than it is in other retaliation cases," *id.* at 261, because "[e]vidence of an [official's] animus does not necessarily show that the [official] induced the action of a prosecutor who would not have pressed charges otherwise." *Id.* at 263. This difficulty, coupled with the "longstanding presumption of regularity accorded to prosecutorial decisionmaking," *id.*, and the fact that "it would be unrealistic to expect a prosecutor to reveal his mind," *id.* at 264, gave the Court considerable pause in determining the circumstances in which a plaintiff alleging a speech-retaliatory prosecution can "bridge the gap [created by the independent judgment of the prosecutor] between the non-prosecuting government agent's motive and the prosecutor's action." *Id.*; *see also id.* at 263 (citing *Smiddy I* as an example of the causation problem).

**[2]** Considering the dilemma created in a First Amendment retaliatory prosecution case by the prosecutor's intervening decision to prosecute, the Court developed a bright-line, objective standard as a substitute for inquiries into the prosecutor's subjective state of mind. Noting that "there will always be a distinct body of highly valuable circumstantial evidence available and apt to prove or disprove retaliatory causation, namely evidence showing whether there was or was not probable cause to bring the criminal charge," *id.* at

---

[11]*Hartman* was brought under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), the "federal analogue" to § 1983. *Hartman*, 547 U.S. at 254, 255 n.2.

261, the Court held that "a retaliatory motive on the part of an official urging prosecution combined with an absence of probable cause supporting the prosecutor's decision to go forward are reasonable grounds to suspend the presumption of regularity behind the charging decision," *id.* at 265. So, under *Hartman*, if a plaintiff can prove that the officials secured his arrest or prosecution without probable cause and were motivated by retaliation against the plaintiff's protected speech, the plaintiff's First Amendment suit can go forward.[12]

**[3]** We see no reason to limit *Hartman*'s probable cause requirement solely to First Amendment retaliatory arrest and prosecution cases. Rather, its logic extends to Fourth Amendment false arrest cases like Beck's, at least to the extent that the plaintiff must prove the absence of probable cause to rebut the presumption of independent prosecutorial judgment, when a prosecutor's actions are interposed between the actions of investigating officials and the arrest. Ordinarily, however, the plaintiff bears the burden of proving the absence of probable cause anyway in a Fourth Amendment false arrest case. Proving lack of probable cause is usually essential to demonstrating that the plaintiff's Fourth Amendment rights were violated. As a practical matter, consequently, *Hartman* will rarely add to the plaintiff's ultimate burden in a § 1983 false arrest case.

## C. *Hartman* and *Smiddy I*

More difficult is the question whether *Hartman* requires that we overrule *Smiddy I* entirely. *Smiddy I* requires that plaintiffs bear a burden of proof, *beyond* proving the absence of probable cause, to overcome the presumption of prosecu-

---

[12]We note that plaintiffs stating " 'ordinary' retaliation claim[s]" posing less complicated causation problems than that addressed in *Hartman*, including actions concerning retaliatory searches, need not allege and show the absence of probable cause. *See Skoog v. County of Clackamas*, 469 F.3d 1221, 1234 (9th Cir. 2006).

torial independence. There is considerable tension between the approach taken by the Court in *Hartman* and the approach set out in *Smiddy I* and the cases following from it. After *Hartman*, it is questionable that *Smiddy I*'s detailed evidentiary inquiry into the independence of the prosecutor's judgment should still be employed to address the causal chain problem in Fourth Amendment cases. The Supreme Court's simpler, probable-cause-based approach may be all that is required with regard to the causation issue in the First Amendment context.

The causal problem is, of course, essentially identical in both contexts, and *Smiddy I* requires an inquiry into the prosecutor's actual mental processes to resolve it, an approach decisively rejected in *Hartman*. *Hartman* does require retaliatory animus, as well as the absence of probable cause, as elements of the constitutional tort there at issue. But the retaliatory animus requirement arises out of the First Amendment-based constitutional tort alleged in *Hartman*. Proof of the absence of probable cause, it appears, is the sole factor necessary to resolve the chain of causation problem. Applying that reasoning, it could be held that that sole factor would also be sufficient in the Fourth Amendment false arrest context, where the absence of probable cause is the substantive lynchpin of the constitutional tort and must be proven in any event.[13]

**[4]** But *Hartman* did not involve a Fourth Amendment-based cause of action. Nor did *Hartman* explain how its reasoning should be applied in such cases. We are mindful that, as a three-judge panel, our ability to overrule circuit precedent

---

[13]In other Fourth Amendment contexts, no more than proof of an absence of probable cause is required. *See Malley*, 475 U.S. at 344 n.7 (indicating, where the arresting officers obtain a warrant without probable cause, that the independent judgment of the warrant-issuing magistrate does not give rise to a causation issue in a Fourth Amendment case against the officers).

is limited. *See Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc). Although the reasoning we have outlined above has a great deal to recommend it, whether *Hartman* is "clearly irreconcilable" with *Smiddy I* is unclear, *see id.* at 900; *Hartman* addressed itself only to the "details specific to retaliatory-prosecution cases," 547 U.S. at 259. As it turns out, Beck can satisfy both *Hartman* and *Smiddy I* on the present record. We therefore need not decide whether *Hartman* overruled *Smiddy I*, and do not do so.

## D. Causation in First and Fourth Amendment Cases After *Hartman*

[5] To summarize: We hold, first, that to the degree *Smiddy I* could be understood under our case law to apply to a First Amendment-based retaliatory arrest or prosecution cause of action, *Smiddy I* is inconsistent with *Hartman* and cannot stand. In such cases, we will not separately inquire, through application of a presumption or otherwise, into the prosecutor's actual state of mind. Instead, a showing of a "retaliatory motive on the part of an official urging prosecution combined with an absence of probable cause supporting the prosecutor's decision" will suffice to rebut the presumption of regularity and settle the causation issue. *Hartman*, 547 U.S. at 265.

[6] Second, in any constitutional tort case, including Fourth Amendment-based cases, in which a prosecutor has instigated a prosecution, it is necessary, if not sufficient, that a plaintiff seeking to sue non-prosecutorial officials alleged to be responsible post-complaint for the arrest or prosecution show the absence of probable cause. If that were not so, *Smiddy I* would be irreconcilable with *Hartman*. *See Miller*, 335 F.3d at 900.[14]

---

[14]It is likely that that burden rested with the plaintiff under *Smiddy I* even before *Hartman*, but we make clear that it does today.

Third, we do not overrule *Smiddy I*'s rebuttable presumption approach in the Fourth Amendment context, leaving the question whether it should be overruled for a case in which the answer matters. Instead, we demonstrate that Beck survives summary judgment even if *Smiddy I* does apply.

To implement our approach, we address Beck's First and Fourth Amendment causes of action separately. But, as the causes of action share the common requirement that Beck show that probable cause for his arrest was absent, we first address that issue and hold that probable cause was, indeed, lacking.

We next hold that Beck has satisfied *Hartman*, preserving his First Amendment cause of action, because he has alleged and shown retaliatory animus under two distinct theories, both of which are viable on the present summary judgment record. *See Blankenhorn*, 485 F.3d at 470. Turning to the Fourth Amendment cause of action, we observe that the prosecutor, Gaetano, asserted privilege rather than testifying as to whether he felt pressure from the police to make his charging decision and whether he was influenced by the police officers' felony submission. Critical evidence necessary to rebut the *Smiddy I* presumption of independence is therefore unavailable, and, under the express language of *Smiddy I* itself, Beck is not required to rebut the presumption of prosecutorial independence. In the absence of the presumption, a rational jury could well conclude that the officers had not met their burden to show "an independent intervening cause cuts off [their] tort liability." *Smiddy I*, 665 F.2d at 267. Beck's Fourth Amendment cause of action therefore also survives.

## E. Beck's Constitutional Causes of Action

### 1. Absence of Probable Cause

We have little difficulty concluding that there was no probable cause to arrest Beck. As we have noted, Beck was

arrested for threatening the officers, in violation of California Penal Code § 69. That provision may be violated by attempting to deter executive officers from their duties by "threat *or* violence." CAL. PENAL CODE § 69 (emphasis added); *see also In re M.L.B.*, 110 Cal. App. 3d 501 (Ct. App. 1980).

To assure that the statute does not violate the First Amendment by sanctioning constitutionally protected challenges to police officers' activities, *see City of Houston, Tex. v. Hill*, 482 U.S. 451, 462-63 (1987), California courts adopted a narrowing construction. Under that construction, adopted as early as 1984, the statute's "threat" provision is applicable only to "threat[s] of unlawful violence used in an attempt to deter an officer." *In re Manuel G.*, 16 Cal. 4th 805, 814-15 (1997); *see also Anderson*, 151 Cal. App. 3d 893, 895-96, 898 (Ct. App. 1984) (same).

As a result of this limiting construction, the threats that have been held to violate § 69 have been unmistakably threats of violence, including " 'Me and my home boys are going to start killing you and your friends,' " *In re Manuel G*, 16 Cal. 4th at 819; " 'I'm tired of you guys fucking with us, and you better watch out, we're going to start knocking you guys off,' " *id.*; " 'We'll get your house. We'll get your cars. You can't be with your family twenty-four hours a day,' " *In re M.L.B.*, 110 Cal. App. 3d at 504; and " 'I am going to kill you. This is a threat. You're dead.' " *People v. Hines*, 15 Cal. 4th 997, 1058 (1997).

Beck's statements bear scant resemblance to those that have been held to violate § 69. In the context of a heated discussion over zoning violations at a civic function, Beck told Chief Thouvenell that he "didn't know who [he] was dealing with." At worst, if we suppose that the more profanity-laced version of Beck's comments that the officers recall is accurate, Beck may also have sworn and told the officers to back off. Regardless of the version of his statements we consider, Beck could not have been understood in context to threaten

violence. In fact, both officers so declared, maintaining only that they thought he was threatening their job security.

We conclude, as did the state court deciding Beck's § 995 motion, that there was no probable cause to arrest Beck for a violation of § 69, much less for a felony violation of that statute. He has therefore made the probable cause showing necessary to support both his First and Fourth Amendment causes of action. We next turn to the other requisite of the First Amendment cause of action, retaliatory motive.

## 2.   The First Amendment Cause of Action: Retaliation

### a.   Scope of Appellate Review

We recognize that the district court did not have the opportunity to consider *Hartman* and, given the way it conducted the *Smiddy I* analysis, did not directly address the retaliation question. Although it will often be "the better approach" to remand in such cases for the district court to "apply the appropriate standards," *see In re Exxon Valdez*, 270 F.3d 1215, 1241 (9th Cir. 2001), "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Singelton v. Wulff*, 428 U.S. 106, 121 (1976).

We are comfortable resolving the *Hartman* retaliation issue on the facts of this case, where the new legal standard arose during the briefing of this appeal, the standard was brought to our attention by one of the parties, and, critically, the retaliation issue was extensively litigated in the district court, albeit under a somewhat different legal framework. *See also Kimes v. Stone*, 84 F.3d 1121, 1126 (9th Cir. 1996) (courts may take up an issue for the first time on appeal "when a change in law raises a new issue while an appeal is pending") (quotation in original omitted); *Golden Gate Hotel Ass'n v. San Francisco*, 18 F.3d 1482, 1487 (9th Cir. 1994) ("Certainly there are cir-

cumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt.") (quoting *Singleton*, 428 U.S. at 121).

The reason the retaliation issue was litigated in the district court, including on the defendants' *Smiddy I*-based motion for summary judgment, is this: Under *Smiddy I*, proof that officials have "deliberately or recklessly misled" a prosecutor is sufficient to show that the prosecutor has not exercised independent judgment. *See Galen v. County of Los Angeles*, 477 F.3d 652, 663-64 (9th Cir. 2007). As part of Beck's theory of deliberate falsehood, he argued that the officers were motivated by retaliatory animus to create a false case against him. The parties therefore litigated that question, which had first been raised in Beck's complaint.[15] Because the retaliation issue has therefore been present in the case from the start, all parties have had ample opportunity to investigate it and to bring forward evidence and legal arguments regarding it.

Nor does the applicability of *Hartman* come as a surprise. Although *Hartman* was published after Beck's opening brief was due, it issued before the officers filed their answering brief. So, in addition to having addressed the retaliation issue throughout the litigation, the officers had a chance to address the *Hartman* framework — as Beck did in his reply brief — although they failed to do so.

Further, because we are reviewing a summary judgment record, we resolve factual disputes in favor of the non-moving party and decide legal issues de novo. It therefore does not matter whether the officers might have paid more attention to rebutting retaliation had they addressed *Hartman*. We would still view the facts in the light most favorable to Beck.[16] In

---

[15]The district court understood Beck to have alleged that he was "arrest[ed] . . . in retaliation for exposing the allegedly illegal contract between the City and Intravaia."

[16]Of course, the officers will have an opportunity to contest Beck's factual version of the case at trial.

sum, the officers suffer no prejudice, *see Kimes*, 84 F.3d at 1126, if we consider here the same retaliation issue which the parties have already litigated in the context of the *Smiddy I* framework.

For these reasons, and because it has already been four years since Beck's arrest and three years since this case was filed, considerations of judicial efficiency lead us to resolve the matter today. Justice would not be served by subjecting the parties to further pre-trial disputes over immunity when the matter can be clearly settled on the present summary judgment record.

### b.   Retaliation

Beck alleges that his arrest was retaliatory in two regards: First, he maintains that the officers arrested him in retaliation for his brusque comments to Chief Thouvenell at the bank opening party. Second, he contends that the officers's actions were the culmination of the extended dispute between Beck and Upland that began with his protests against the rubble removal contract and were in retaliation for that protest. On the summary judgment record, a rational jury could find for Beck on either theory, *see Blankenhorn*, 485 F.3d at 470, satisfying *Hartman*.

**[7]** As to the first theory: Beck presented evidence showing that he had a heated confrontation with Chief Thouvenell and Sergeant Mendenhall at the bank opening party. He could show that, in the heat of the moment, Thouvenell had told him that "we should have taken care of you a long time ago." He also presented evidence from the Chamber of Commerce meeting, indicating that Thouvenell, Mendenhall, and Milhiser had been agitated over Beck's comments and that Thouvenell, in particular, had threatened that he would take legal action against Chamber members who interfered with

**[8]** Beck also could show that the police, the alleged victims of his crime, did not investigate the matter beyond mak-

ing a few phone calls before going to the District Attorney to file charges and secure an arrest warrant. Further, the police report left out Thouvenell's hostile comment to Beck and reported the crime as a potential felony, rather than as a misdemeanor, suggesting that it was written to cast Beck in the worst possible light.

[9] As viewed most favorably to Beck, the facts in this regard resemble those in *Duran*, in which a police officer stopped and arrested a man who first "exchanged a few heated words" with him and who then made obscene gestures at him just before the arrest. 904 F.2d at 1374-75. In that case, we first held that probable cause for the stop was absent and then warned that it appeared that the officer stopped the plaintiff "at least partly in retaliation for the insult he received" from him. *Id.* at 1377 78. Beck's showing of a heated personal confrontation followed by a hasty arrest likewise could rationally support a finding of retaliatory animus.

[10] Even if it did not adopt the above theory based on personal retaliatory animus, a rational jury could find that the arrest was the culmination of Beck's long-running dispute with Upland over his efforts to block the rubble removal contract. Beck presented a substantial case that his protests created the tensions that led to his arrest. First, Beck could show that Chief Thouvenell himself had advised him to work out a deal with his competitor to share the contract. Second, he could demonstrate that his competitor had suggested investigating him for zoning violations after threatening that "every agency" in Upland would be "down on top of [Beck]." Beck could present evidence that such investigations of existing nonconforming businesses were against city policy, and that, at the time of the relevant zoning changes, Upland's senior planner was "not aware of one single" enforcement action against an existing nonconforming use in Upland's history. Further, he could demonstrate that Chief Thouvenell and Sergeant Mendenhall were involved in the code enforcement action, and that Beck and Mendenhall had had a dispute when

Mendenhall arrived to discuss the zoning problems with him. In addition to these showings, he could add the incidents we have already described, including, in particular, Chief Thouvenell's statements at the Chamber of Commerce meeting. In short, even if the jury did not believe that the police would retaliate against Beck solely because of the confrontation at the bank opening party, Beck could make out a case that the confrontation was the culmination of a longer conflict rooted in his First-Amendment-protected contract protest, and that the arrest was in retaliation for Beck's overall role in that conflict.

Viewed in that light, the facts in this case closely parallel those in *Hartman*. The plaintiff in *Hartman*, Moore, made equipment used by the postal service and successfully lobbied against a policy that would have favored his competitors. *Hartman*, 547 U.S. at 252-54. After he succeeded, Postal Service inspectors began to investigate him for various crimes; he was prosecuted but was cleared of all charges. *Id.* at 254. Record evidence showed that the inspectors had pressured the U.S. Attorney to prosecute, had thin evidence to support their criminal allegations, and had been angered by Moore's activities. *See Moore v. Hartman*, 388 F.3d 871, 882-85 (D.C. Cir. 2004).[17] Similarly, Beck lobbied against government action that would have favored his competitors and found himself under investigation. While Beck might or might not ultimately succeed in convincing a jury that his advocacy efforts prompted the zoning investigation that escalated into the arrest, a rational jury looking at the present record in the light most favorable to Beck could so infer.

[11] Thus, under either view of retaliatory animus, Beck has met the retaliation prong of *Hartman*. As we have discussed, he has also shown that probable cause was absent. He

___

[17]Because the Supreme Court considered only the probable cause question, *Hartman*, 547 U.S. at 256-57, it left the D.C. Circuit's retaliation findings undisturbed.

has therefore completed the *Hartman* showing, and his First Amendment cause of action survives.

### 3.   The Fourth Amendment Cause of Action: Invocation of Privilege

The absence of probable cause also supports Beck's Fourth Amendment cause of action. The *Smiddy I* framework, however, requires more. For the reasons we have explained, we address that framework here.

[12] We need not, however, consider, as did the district court, whether the evidence Beck presented was sufficient to meet the plaintiff's *Smiddy I* burden of rebutting the presumption of prosecutorial independence. *Smiddy I* held that where invocations of privilege render "relevant evidence" concerning the prosecutor's decision to prosecute unavailable, no presumption of prosecutorial independence arises, and the plaintiff need not rebut it. 665 F.2d at 267-68.[18] Here, the prosecutor, Gaetano, invoked privilege to shield relevant evidence.

The basis for this privilege-based limitation on the plaintiff's *Smiddy I* burden is the same concern that led the Supreme Court in *Hartman* to abjure a subjective inquiry into the prosecutor's state of mind — namely, that ascertaining that state of mind is likely to be exceedingly difficult. *See Hartman*, 547 U.S. at 264. Where the prosecutor claims privilege regarding key factual inquiries essential to rebutting the *Smiddy I* presumption, it is unfair to the plaintiff to apply the presumption, and, pursuant to *Smiddy I*'s caveat, we may not do so.

Gaetano did answer some questions with regard to his charging decision: He explained the nature of the process and

---

[18]After *Hartman*, of course, the plaintiff always carries the initial burden of showing the absence of probable cause.

said that he had not actually been ordered by Chief Thouvenell or Sergeant Mendenhall to prosecute Beck. But Gaetano twice asserted privilege when asked if he had been "swayed" or "pressure[d]" by the police in his charging decision.

[13] The answers to the questions Gaetano refused to answer are obviously central to the presumption of independent judgment that underlies *Smiddy I*'s causal analysis. Among the bases for overcoming the *Smiddy I* presumption is "a showing that the district attorney was pressured or caused by the investigating officers to act contrary to his independent judgment." *Smiddy I*, 665 F.2d at 266. With Gaetano's answers to questions directed precisely at that consideration off the table, Beck cannot be required to come forward with evidence to rebut the presumption of Gaetano's independent judgment. Instead, the burden of showing that Gaetano acted independently falls on the officers.

A rational jury could find that the officers had not met their burden to show that Gaetano's judgment was sufficiently independent as to amount to an intervening cause shielding them from liability. *See id.* at 267. The officers were the purported victims of the crime. Their own descriptions of the incident were at the core of the brief police report. Gaetano testified that he conducted no additional legal or factual investigation of his own. Even when privilege is not asserted, we have expressed concern about the application of the *Smiddy I* presumption where "[t]he prosecutor's only information came from the police reports." *Barlow v. Ground*, 943 F.2d 1132, 1137 (9th Cir. 1991); *see also Blankenhorn*, 485 F.3d at 484; *Newman v. County of Orange*, 457 F.3d 991, 995 (9th Cir. 2006); *Borunda v. Richmond*, 885 F.2d 1384, 1390 (9th Cir. 1988). Here, in addition to the presence of police as victims and Gaetano's failure to do any additional investigation, Gaetano's decision to charge Beck's comments as a felony, as the police report suggested, and the omission of Thouvenell's comments to Beck in the police report all call the independence of Gaetano's judgment into serious question.

**[14]** In short, Beck has demonstrated that there was no probable cause for his arrest, and the officers have not met their burden to show that Gaetano's judgment acted as an intervening cause. We therefore hold that, on the present record, Beck's Fourth Amendment cause of action may go forward.

### F.   Qualified Immunity

Beck has met his burden to establish causation on both his First and Fourth Amendment causes of action. The remaining issue on the § 1983 causes of action is whether Chief Thouvenell and Sergeant Mendenhall are entitled to qualified immunity.[19] We address that question now.

We have already explained that, on this summary judgment record, Beck was arrested in retaliation for his speech and that the arrest was without probable cause. Those explanations satisfy the first step of the qualified immunity inquiry with regard to the First and Fourth Amendment issues, and we will not repeat them here. *See Saucier*, 533 U.S. at 201 (discussing step one of the qualified immunity inquiry) All that remains is to determine whether the pertinent law was clearly established at the time of the incidents in this case. *See id.* (discussing step two). It was.

**[15]** Regarding the First Amendment cause of action: Arresting someone in retaliation for their exercise of free speech rights was violative of law clearly established at the time of Beck's arrest. By 1990, it was "well established . . . that government officials in general, and police officers in particular, may not exercise their authority for personal

---

[19]The officers do not argue that the intervening actions of the judge issuing the warrant are of relevance, nor could they do so. As we have noted, *supra* n.13, the Supreme Court has held that the ordinary qualified immunity standard applies in such cases, without an additional causation step. *See Malley*, 475 U.S. at 344-45 & 344 n.7, 346 n.9.

motives, particularly in response to real or perceived slights to their dignity. Surely anyone who takes an oath of office knows — or should know — that much." *Duran*, 904 F.2d at 1378; *see also id.* ("[W]hile police, no less than anyone else, may resent having obscene words and gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment."); *United States v. Poocha*, 259 F.3d 1077, 1080 (9th Cir. 2001) ("The Supreme Court has consistently held that the First Amendment protects verbal criticism, challenges, and profanity directed at police officers unless the speech is likely to 'produce a clear and present danger of a serious substantive evil.' ") (quoting *Hill*, 482 U.S. at 461); *Guilford v. Pierce County*, 136 F.3d 1345, 1349 (9th Cir. 1998) (same); *MacKinney v. Nielsen*, 69 F.3d 1002, 1007 (9th Cir. 1995) (citing *Duran* for the proposition that there is a clearly established "First Amendment right to challenge the police. Even when crass and inarticulate, verbal challenges to the police are protected.").

[16] Regarding the Fourth Amendment cause of action: As we have discussed, the California courts limited § 69 "threat" violations to threats of violence as early as 1984. The California Supreme Court ratified that interpretation in 1997, seven years before Beck's arrest in 2004. *See In re Manuel G.*, 16 Cal. 4th at 814-15. We are aware of no conflicting California cases. The arrest was therefore in violation of clearly established law at the time it occurred, as it was without probable cause under then-existing California law.

[17] In short, well before 2004, "a reasonable official [in Sergeant Mendenhall's position] would understand" that arresting an individual in retaliation for protected speech is constitutionally impermissible. *See Saucier*, 533 U.S. at 202. Such an officer would also have known that the warrant application and criminal complaint were objectively unsupported by probable cause. Sergeant Mendenhall therefore may not

claim qualified immunity from liability resulting from the criminal complaint or the warrant application he filed.

**[18]** Chief Thouvenell's position is slightly different: He did not sign or prepare the police report, the criminal complaint, or the declaration submitted to secure the warrant. We have held, however, that a supervising official may be liable in his individual capacity if he "set in motion a series of acts by others, or knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known, would cause others to inflict the constitutional injury." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (internal alterations omitted). Thouvenell was one of Beck's purported victims. He approved Mendenhall's investigation of the incident and told him to present it to the prosecutor. It should have been clear to Thouvenell from the start that there was no probable cause to arrest Beck. Yet, he failed to do anything to stop the process that led to the arrest, but instead abetted it and threatened Chamber of Commerce members when they attempted to get involved. He, too, may not claim qualified immunity here.

There is no remaining barrier to Beck's § 1983 causes of action. We therefore reverse the district court's grant of summary judgment against Beck on the issue.[20]

## G.   The State Law Causes of Action

**[19]** The district court also granted summary judgment against Beck on his state law causes of action, relying upon California Civil Code § 43.55(a), which provides in pertinent part that:

---

[20]The district court did not reach the question whether the City of Upland or the Upland Police Department is liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), if Chief Thouvenell and Sergeant Mendenhall are liable, and Beck does not raise it on this appeal. We therefore do not decide the issue.

> There shall be no liability on the part of, and no cause of action shall arise against, any peace officer who makes an arrest pursuant to a warrant of arrest regular upon its face if the peace officer acts without malice and in the reasonable belief that the person arrested is the one referred to in the warrant.

The district court held that Beck had not presented sufficient evidence to create a material issue as to whether the officers acted maliciously, so the statutory immunity applies. We disagree.[21]

Under California law, "[m]alice may be determined by taking into account all circumstances surrounding the arrest allegedly known to the arresting officer." *McKay v. County of San Diego*, 111 Cal. App. 3d 251, 254 (Ct. App. 1980). Malice "may be proved by circumstantial evidence, and is defined as that attitude or state of mind which actuates the doing of an act for some improper or wrongful motive or purpose. It does not necessarily require that the defendant be angry or vindictive or bear any actual hostility or ill will toward the plaintiff." *Laible v. Superior Court of the City and County of San Francisco*, 157 Cal. App. 3d 44, 53 (Ct. App. 1984) (quotation marks omitted). Moreover, liability for an unlawful arrest extends beyond the arresting officer if immunity is not present: "A party who authorizes, encourages, directs or assists an officer to do an unlawful act, or procures an unlawful arrest, without process, or participates in the unlawful arrest or imprisonment is liable." *Harden v. San Francisco Bay Area Rapid Transit District*, 215 Cal. App. 3d 7, 15 (Ct. App. 1989) (internal alterations and quotation marks omitted).

[20] Applying these concepts, both Sergeant Mendenhall and Chief Thouvenell may be held liable for false arrest under California law if they acted maliciously. The evidence of

---

[21]The officers do not argue that they benefit from any other source of state law immunity, so we address only § 43.55(a).

retaliatory intent we have already surveyed is sufficient to allow a rational jury to find that both the officers "acted for some improper or wrongful motive or purpose." *Laible*, 157 Cal. App. 3d at 53; *see also id.* at 54 ("It is for the trier of fact . . . to weigh the available inferences against [the officers'] profession of pure motives."). They are thus not immune under § 43.55(a).

### III.   Conclusion

Beck's case may go forward. We remand for trial.

**REVERSED AND REMANDED.**

---

IKUTA, Circuit Judge, concurring in part, dissenting in part:

In my view, the district court's grant of summary judgment must be reversed for two reasons. First, the district court granted the defendants' motion for summary judgment and dismissed Beck's § 1983 cause of action based in part on its determination that the police officers had probable cause to arrest Beck. This determination was erroneous: the police officers lacked probable cause to arrest Beck as a matter of law. *See In re Manuel G.*, 16 Cal. 4th 805, 814-15 (1997).

Second, the district court determined that the officers were immune from liability under *Smiddy v. Varney*, 665 F.2d 261 (9th Cir. 1981), due to the prosecutor's intervening action of filing a criminal charge against Beck. The Supreme Court's recent opinion in *Hartman v. Moore*, 547 U.S. 250 (2006), casts doubt on the district court's conclusion, at least with respect to Beck's allegation that the police officers arrested him in retaliation for his exercise of First Amendment rights. Beck had attempted to rebut the *Smiddy* presumption (i.e., the presumption that a prosecutor's filing of criminal charges constitutes an exercise of independent judgment that immu-

nizes investigating officers) by showing that the police officers unduly pressured or deceived the prosecutor. *See Smiddy*, 665 F.2d at 266-68. However, *Hartman* indicates that the prosecutor's intervening action will not immunize the police officers from a First Amendment retaliatory arrest claim if Beck can establish that the police officers lacked probable cause and had a retaliatory intent. 547 U.S. at 265. Because the district court did not have the benefit of *Hartman*, and thus did not apply the correct test to Beck's First Amendment claim, we must reverse the grant of summary judgment in favor of the defendants. I agree with the majority to that extent, and join in Sections I, II A (excluding the majority's holding), II B, paragraphs 1, 2 and 4 of Section II D, and Section II E 1.

However, in my view, it is not appropriate to go further and address issues neither briefed to nor decided by the district court. Although a First Amendment claim was lurking in Beck's complaint, the parties did not discuss it and the district court did not address it. By the same token, the parties did not develop their arguments on this key question whether the record raised a material issue of retaliatory intent on the part of the police officers. It is inappropriate for us to reach this mixed issue of law and fact for the first time on appeal in the absence of development by the parties or a ruling by the district court. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It is the general rule . . . that a federal appellate court does not consider an issue not passed upon below.").

Nor should we reach the question whether the *Smiddy* presumption immunized the police officers from liability under Beck's Fourth Amendment false arrest claim. The district court had concluded that the police officers were immunized under *Smiddy* because Beck had failed to show that the police officers unduly pressured or deceived the prosecutor. Rather than address the district court's ruling, the majority rests its determination that the *Smiddy* presumption does not immunize the police officers from Beck's Fourth Amendment false

arrest claim on a new ground: the *Smiddy* presumption fails because the prosecutor raised the attorney-client privilege and refused to answer some of Beck's questions. *See* maj. op. at 6063-65. But neither party raised this argument even on appeal—it appears for the first time in the majority opinion. In my view, it is inappropriate for the majority to decide a key issue on an unbriefed rationale sua sponte, without giving the defendants any opportunity to rebut the majority's reasoning. *See Hartmann v. Prudential Ins. Co. of Am.*, 9 F.3d 1207, 1214 (7th Cir. 1993) (Posner, J.) ("Our system unlike that of the Continent is not geared to having judges take over the function of lawyers, even when the result would be to rescue clients from their lawyers' mistakes.").

"Our judicial system generally assumes that consideration of an issue at both the trial court and appellate court level is more likely to yield the correct result, because the issue will be more fully aired and analyzed by the parties, because more judges will consider it, and because trial judges often bring a perspective to an issue different from that of appellate judges." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1154 (9th Cir. 2000). In the interest of fairness to the defendants and deference to the district court, I would reverse the district court on the narrow grounds explained above, and remand this case for further proceedings.