**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LEONARD MCSHERRY,
          *Plaintiff-Appellant,*

          v.

CITY OF LONG BEACH; LONG BEACH
POLICE DEPARTMENT; NORMAN
TURLEY, Officer; CARTHEL S.
ROBERSON, in his individual and
official capacities,
          *Defendants-Appellees.*

No. 06-55837

D.C. No.
CV-02-03767-RGK

ORDER AND
OPINION

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted
February 14, 2008—Pasadena, California

Order and Opinion Filed October 20, 2009

Before: Stephen S. Trott, Richard R. Clifton, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Trott

14575

## COUNSEL

Mark A. Borenstein, Overland Borenstein Scheper & Kim LLP, Los Angeles, California, for the plaintiff-appellant.

Michael M. Mullins and Nowland C. Hong (argued), Akerman Senterfitt LLP, Los Angeles, California, for the defendants-appellees.

## ORDER

The Opinion filed March 30, 2009, slip op. 3805, and appearing at 560 F.3d 1125 (9th Cir. 2009), is withdrawn. It may not be cited as precedent by or to this court or any district court of the Ninth Circuit.

The superseding opinion will be filed concurrently with this order. The parties may file an additional petition for rehearing or rehearing en banc. All other pending motions are denied as moot.

## OPINION

TROTT, Circuit Judge:

**I**

After Leonard McSherry ("McSherry") served almost fourteen years in prison for kidnaping, raping, and molesting a six-year-old girl, he was exonerated by DNA evidence acquired from George Valdespino and Valdespino's subsequent confession to these crimes. McSherry was released from prison pursuant to a writ of habeas corpus issued by the Los Angeles Superior Court. Alleging violations of his civil rights pursuant to 42 U.S.C. § 1983, he then filed suit related to his arrest and conviction against Defendants City of Long Beach, Long Beach Police Department ("LBPD"), and the officers he claimed were responsible for his faulty conviction, Detective Norman Turley ("Turley"), and Sergeant Carthel S. Roberson ("Roberson").

This appeal follows the district court's plenary grant of summary judgment to Defendants on the basis of qualified immunity. We have jurisdiction, and we affirm. *San Jose Christian College v. City of Morgan Hill*, 360 F.3d 1024, 1030 (9th Cir. 2004) ("We may affirm the district court's grant of summary judgment on any basis supported in the record.").

## II

## BACKGROUND

### A.  Factual Background

#### 1.  *The initial descriptions of the suspect and car*

In March of 1988, a six-year-old girl was kidnaped from a playground on a Navy base in Long Beach, California. She was molested and raped by her kidnapper and then released. The abduction was witnessed by her four-year-old brother. Within ten hours of the kidnaping, LBPD patrol officers interviewed her. Initially she described her kidnapper as a short, fat, white male with black hair, who was older than her grandfather. Her brother told police that the man who took his sister was "red in color" and had black hair. Both sister and brother said the suspect made her get into a green car.

Shortly after the victim's return, a neighbor, Robin Davis ("Davis"), reported she had seen a white male, thirty-five years old or older, 5'7"-5'9" tall, heavy, with dark brown to black hair, a mustache, heavy black eyebrows, and a chubby pock-marked face, in the area on the day the victim was abducted. Davis said she saw an unattended 1970's model, dark green, larger model pickup truck with a white cab-over camper in the parking lot by the playground.

#### 2.  *Photo and physical identifications of McSherry and the vehicle*

On April 19, 1988, Officer Turley interviewed the victim in the Charter Hospital in Long Beach, California. He showed her a photo line-up that included a suspect named John Larocco. The other photos in the lineup, including McSherry's, were simply "fillers."

McSherry's photo was on file because of his criminal record. On June 16, 1970, McSherry forcibly abducted and

sexually molested a six-year-old girl and later pleaded guilty to felony child molestation. On January 15, 1975, McSherry was convicted of lewd and lascivious conduct towards an eight-year-old girl and served four years in state prison. On July 8, 1979, McSherry was convicted of kidnaping a fifteen year-old girl, and served six years before being paroled. In 1986 McSherry was convicted of a misdemeanor involving children and sentenced to county jail. Turley was a witness in that case. McSherry's official record shows that he first registered as a sex offender in California with respect to children in 1971 and renewed that registration in 1985.

Turley said that because he believed McSherry was still in jail on his 1986 misdemeanor conviction at the time the crime under investigation was committed, McSherry was not a suspect. Unexpectedly, the victim picked McSherry's photo out of the lineup. Later, Turley learned that McSherry had been released early from jail before this crime occurred.

During that same interview, Turley showed the victim pictures of sixteen different campers/trucks to try and determine in what kind of vehicle she had been kidnaped, but she said the vehicle was a car, not a truck. Turley said she seemed confused but could communicate.

On April 21, 1988, Turley re-interviewed the victim. He showed her the same photo lineup as he had shown her on the 19th, but, out of "fairness," in a different order. She again picked McSherry. Turley also showed her photographs of nine cars. She identified a car, and then after Turley asked her if she was sure, she identified a different car. Turley determined that she was confused and told her that he wanted her to look at all of the cars before she told him if she saw the car or not. Turley changed the order of the photographs, and she picked out McSherry's father's yellow station wagon.

On May 16, 1988, Turley and Navy Investigative Officer Tammy Warmack ("Warmack") interviewed the victim's

brother. They showed him a photo lineup of nine vehicles, and he picked out the same car his sister had chosen. He then identified McSherry from a photo lineup.

Subsequently, on July 21, 1988, the victim and her brother were taken at the request of McSherry's attorney to a court-ordered physical lineup. After the lineup was over and she was out in the hallway, she volunteered first to her mother and then to Warmack that the person who took her was number three (McSherry), not number six, as she had written down. She said that she wrote down six because she was afraid. Ten minutes later, she reaffirmed these statements to Roberson. During the same lineup, her brother picked out number four. The victim also positively identified McSherry under oath during a preliminary hearing and later at trial.

Robin Davis picked McSherry's photo out of a lineup on May 18, 1988, the day after McSherry was arrested. This lineup was witnessed by Warmack. Warmack said that Davis' selection of McSherry "appeared independent" (*i.e.*, not coached). Davis selected McSherry again in a later physical lineup, made an in-court identification of him during a preliminary proceeding, and identified him again in court at his trial.

At McSherry's trial, Turley testified that each time he showed photos to the victim, her brother, and Davis, he told them that they did not have to identify anyone, or any particular vehicle. With respect to the victim and her brother, this admonition is reflected in the police reports. Warmack testified at McSherry's trial that Turley did not make any effort to influence the victim in her selections during the photo lineups.

### 3. *The descriptions and identification of the house*

Turley and Roberson arrested McSherry for these crimes on May 17, 1988. In her initial interview with police, the victim described the place where she was taken as a white house

with two rooms, a bedroom and a bathroom. She said the numbers one and zero were on the door. At some other point, when Turley and Roberson were driving her around, she said that the house was brown.

The day after McSherry's May 17th arrest, Turley and Warmack interviewed the victim again. She picked McSherry's grandparents' home out of a photo lineup, identifying it as the place McSherry had taken her. The grandparents' residence was blue and white. She provided specific details about the room where she had been raped. Warmack said most of the questions were open ended. On the same day, Deputy District Attorney Ken Lamb authorized on behalf of the Los Angeles County District Attorney's Office the filing of a felony complaint charging McSherry with various felonies against the victim.

On May 19th, police served a search warrant at McSherry's grandparents' house. The victim's description generally matched a bedroom in the residence. While executing the warrant, officers noticed a bird in the living room area, and a barking dog in the backyard. Turley re-interviewed the victim on May 24th and asked if she had heard or seen any animals. She said she heard a bird. He asked her several other questions regarding the interior of the house, and her responses matched details of the residence. Finally, when asked if she saw a phone, she said she saw a white push button phone. McSherry's room contained only a black rotary phone.

## B.    Procedural History of the Present Case

McSherry brought suit under 42 U.S.C. § 1983, alleging (1) Fourteenth Amendment due process violations for unconstitutional interview procedures; (2) Fourth and Fourteenth Amendment false arrest claims based on false witness identifications; (3) failure to train and supervise; (4) negligent hiring; and (5) supervisory liability. He claimed damages arising

from Turley's and Roberson's alleged errors that directly and proximately caused his wrongful arrest, trial, conviction, and incarceration.

In October 2003, on the first day scheduled for trial, the district court granted Defendants' Motion for Judgment as a Matter of Law under Fed. R. Civ. P. 50 on the ground of qualified immunity. McSherry appealed. A panel of our court held on procedural grounds that a "district court may not grant a motion filed under Rule 50 prior to the presentation of any evidence in a case . . . because the non-moving party must be afforded the opportunity to present evidence, and the court must evaluate that evidence. . . ." *McSherry v. City of Long Beach*, 423 F.3d 1015, 1021 (9th Cir. 2005). The panel explained that it was concerned that "McSherry was not provided an adequate opportunity to present evidence in his case. Furthermore, disputed issues of fact evident on the face of McSherry's pre-trial contentions of fact render judgment as a matter of law on the basis of qualified immunity inappropriate at this time." *Id.* The panel explained also that treating the motion as a motion for judgment on the pleadings, "[t]he facts alleged by McSherry support a claim of deliberate fabrication, and thus, *on the basis of the pleadings*, the defendants are not entitled to qualified immunity as a matter of law." *Id.* at 1021-22 (emphasis added). In a footnote, we said that McSherry "was not informed that he should treat [Defendants' motion] as a motion for summary judgment and provide evidence in support of his claims." *Id.* at 1021 n.4. We remanded to the district court "for further proceedings consistent with this opinion." *Id.* at 1022. We denied McSherry's request that the case be remanded to a different judge. *Id.* at 1024.

On remand, the district court granted summary judgment to Defendants on the ground of qualified immunity. The court held that probable cause existed for McSherry's arrest. It further held that the fabrication of the evidence claim failed because (1) McSherry did not present "any evidence that Defendants deliberately fabricated evidence, or acted in a way

that produced false information"; (2) the District Attorney had conducted an independent investigation of the evidence, and under the totality of the circumstances, there was "no evidence that Defendants knew or should have known that McSherry was innocent"; and (3) McSherry "failed to make or support any factual allegations of any fabrication of evidence . . . that were logically capable of supporting" a claim that Turley used unconstitutionally suggestive interview techniques. Finally, the district court held that the *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), claim against the City and LBPD failed because McSherry did not show a constitutional violation by either Roberson or Turley.

## III

## DISCUSSION

### A. Standard of Review

This court reviews de novo a district court's grant of summary judgment on the ground of qualified immunity. *Blankenhorn v. City of Orange*, 485 F.3d 463, 470 (9th Cir. 2007). "We may not affirm a grant of summary judgment if there is any genuine issue of material fact or the district court incorrectly applied the substantive law." *Id.* Stripped to its core, our inquiry is "whether the evidence presented a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In making this determination, we view the evidence in the light most favorable to McSherry. All justifiable inferences are to be drawn in his favor and his evidence is to be believed. We may affirm on the basis of any ground supported by the record. *San Jose Christian College*, 360 F.3d at 1030.

**B.    Analysis**

**1.    *Probable cause for the arrest***

McSherry claims that Defendants lacked probable cause to arrest him because they: (1) used suggestive interview techniques; (2) manipulated or coerced witnesses; (3) fabricated evidence; and (4) disregarded exculpatory evidence.

**[1]** "Probable cause arises when an officer has knowledge based on reasonably trustworthy information that the person arrested has committed a criminal offense." *Gausvik v. Perez*, 345 F.3d 813, 818 (9th Cir. 2003) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part." *Brinegar v. United States*, 338 U.S. 160, 176 (1949).

Here, before McSherry was arrested, the victim on two occasions positively identified McSherry as her attacker, and also identified his father's car as the vehicle used to facilitate the crime. Scientific evidence reported by the Sheriff's Crime Laboratory indicated that semen taken from the victim's underwear could belong to McSherry in that he could not be excluded as the person whose semen was found. Also, McSherry's modus operandi known to the police from previous convictions was similar to the manner in which the victim was abducted and sexually assaulted.

**[2]** McSherry attempts to undercut probable cause with allegations that the officers violated the Due Process clause of the Fourteenth Amendment by ignoring exculpatory evidence. "A police officer's failure to preserve or collect potential exculpatory evidence does not violate the Due Process Clause unless the officer acted in bad faith." *Cunningham v. City of Wenatchee*, 345 F.3d 802, 812 (9th Cir. 2003).

McSherry claims that Defendants acted in bad faith when they ignored: 1) George Valdespino's arrest for a crime simi-

lar to the victim's abduction one week later in a nearby county; 2) the fact that initial identification statements by Davis, the victim, and the victim's brother did not resemble McSherry; and 3) the possibility that Davis's identification was influenced by a newspaper photograph of McSherry. These claims fail.

[3] First, McSherry does not offer any evidence that Defendants knew in 1988 that Valdespino was arrested in a nearby county for a similar crime. Absent such a showing, there is no evidence of bad faith.

[4] Second, as to the descriptions of the perpetrator given by the victim and her brother, police officers "must be given some latitude in determining when to credit witnesses' denials and when to discount them, and we are not aware of any federal law . . . that indicates precisely where the line must be drawn." *Devereaux v. Abbey*, 263 F.3d 1070, 1075 (9th Cir. 2001) (en banc). Turley and Roberson do not dispute that McSherry did not closely resemble the initial descriptions given by the two children, however, nothing in the record shows that the officers acted in bad faith by relying on the children's photo lineup identification of McSherry rather than their initial descriptions.

Third, with respect to Davis' identification of McSherry in a photo lineup, McSherry argues that Davis was shown a photo lineup after McSherry's picture appeared in the paper, implying that she chose him because she recognized him from the newspaper photo. This bald assertion does not demonstrate bad faith. McSherry does not offer any evidence whatsoever that Davis ever saw the picture, or that she based her subsequent identification on that picture.

Fourth, McSherry's allegations of the use of improper, unreliable and suggestive identification procedures turn out upon examination to be without adequate factual support. Surmise, conjecture, theory, speculation and an advocate's sup-

positions cannot "do duty for probative facts" and valid inferences. *Poppell v. City of San Diego*, 149 F.3d 951, 962 (9th Cir. 1998).

As for McSherry's allegations of fabrication of evidence, this claim pertains to incidents involving McSherry's grandparents' home as possibly the location of the sexual assault. These matters occurred after McSherry's arrest and are therefore irrelevant to the question of probable cause.

**[5]** The probable cause to arrest McSherry as well as to hold him to answer for trial was confirmed in a preliminary hearing held before a neutral magistrate where the victim again identified McSherry as her attacker, this time under oath. *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) ("[W]e hold that the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest."). Neither Turley nor Roberson testified at this hearing which resulted in the filing of a felony information against McSherry in Los Angeles Superior Court.

**[6]** "In California, . . . it is a long-standing principle of common law that a decision by a judge or magistrate to hold a defendant to answer after a preliminary hearing constitutes *prima facie* — but not *conclusive* — evidence of probable cause." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004) (emphasis in original). We held in *Awabdy* that one way a "plaintiff can rebut a prima facie finding of probable cause is by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith." *Id.* To do so, a plaintiff must be "able to prove the allegations in his complaint that the criminal proceedings were initiated on the basis of the defendants' intentional and knowingly false accusations and other malicious conduct." *Id.* McSherry has not alleged facts sufficient to create a genuine dispute on this issue for reasons discussed in section B.2 of this opinion.

**[7]** Accordingly, we hold that there exists no genuine issue of material fact regarding probable cause or the legality of McSherry's arrest and detention for trial. Finding no constitutional violation on this issue, we affirm the district court.

## 2. *Causation*

**[8]** In *Beck v. City of Upland*, 527 F.3d 853 (9th Cir. 2008), a case decided after briefs were filed and we heard oral argument in this matter,[1] we held that "in any constitutional tort case . . . in which a prosecutor has instigated a prosecution, it is necessary, if not sufficient, that a plaintiff seeking to sue non-prosecutorial officials alleged to be responsible post-complaint for the arrest or prosecution show the absence of probable cause." *Id.* at 865 (citing *Smiddy v. Varney*, 665 F.2d 261 (9th Cir. 1981), and *Hartman v. Moore*, 547 U.S. 250 (2006)). Relying on the Supreme Court's decision in *Hartman*, we said "[a] prosecutor's independent judgment may break the chain of causation between the unconstitutional actions of other officials and the harm suffered by a constitutional tort plaintiff." *Beck*, 527 F.3d at 862. We added that "[p]ut in traditional tort terms, the prosecutor's independent decision can be a superseding or intervening cause of a constitutional tort plaintiff 's injury, precluding suit against the officials who made an arrest or procured a prosecution." *Id. See also*, *Stoot v. City of Everett*, ___ F.3d ___, ___ (No. 07-35425 9th Cir. August 13, 2009) (an intervening decision of an informed neutral decision-maker may break the chain of causation).

In *Beck*, we concluded on the record (1) that Beck was arrested without probable cause, and (2) that the officers had not met their burden to show that the prosecutor's charging decisions acted as an "intervening cause," thus shielding them from liability. *Beck*, 527 F.3d at 870.

---

[1]Both parties have now given us their views on *Beck* and *Hartman*.

**[9]** On the record in this case, however, the opposite is true. Substantial evidence of probable cause existed for McSherry's arrest and to bind him over for trial. There is no question that the prosecutor's actions in authorizing all charges against McSherry and conducting his prosecution were (1) amply supported by probable cause at all stages of the process, and (2) the result of his independent professional judgment based upon a thorough review of the evidence, a judgment that was predicated on eyewitness identification related to him and uninfluenced by either Turley or Roberson or the "evidence" McSherry claims was fabricated. Because McSherry cannot survive summary judgment on this critical issue, his related claims must fail.

In the ordinary course of business, Turley took McSherry's case to Deputy District Attorney Ken Lamb, a prosecutor with ten years of previous experience as a police officer. Lamb's declaration filed in support of the officers' motion for summary judgment reads as follows:

## DECLARATION OF DEPUTY DISTRICT ATTORNEY

### KEN LAMB

I, Ken Lamb, declare and state as follows:

1. I am a Deputy District Attorney for the County of Los Angeles, and I was the trial deputy in the case of the *People v. Leonard McSherry*, Case No. A 040264.

2. Before I became a Deputy District Attorney, I was a member of the Los Angeles Police Department for ten years. During my career as a police officer and as a district attorney, I have interviewed over a thousand children, and have now been involved in the investigation of sexual abuse crimes for over eighteen years. I have conducted training seminars

on sexual assault crimes, including techniques for interviewing children. Throughout my career, I have prosecuted over 600 felony jury trials.

3. I make this declaration in support of the Defendant's Motion for Summary Judgement. The facts set forth herein are true of my own personal knowledge, except for those things stated on information and belief, which are believed to be true, and if called upon to testify thereto, I could and would competently do so under oath.

4. Leonard McSherry ("McSherry") was arrested for the kidnap and rape of six year-old [ ] . . . on May 17, 1988. On May 18, 1988, I authorized that he be charged with (1) forcible rape; (2) oral copulation of a person under age 14 and more than 10 years younger; (3) rape by a foreign object; and (4) kidnaping to commit child molestation of a victim under the age of 14.

5. After McSherry's arrest, I reviewed all of the evidence, including the witnesses' identifications, the witnesses' statements, the police officers' statements, the physical evidence, the criminal lab results, and other corroborating evidence, to ensure that there was a case against McSherry.

6. In addition, I reviewed the police reports, the photo lineups, and the live lineups in order to ensure their lawfulness.

7. Furthermore, I interviewed the witnesses in order to verify the information provided to me by the police officers.

8. I personally interviewed [the victim] on more than one occasion. During the interviews, I was con-

vinced by her demeanor and language that she was describing what she remembered from her kidnaping, rather than from any coaching or outside influence. Based upon my experience with child victims of sexual assault, I further believed that her emotional state was such that it would have been virtually impossible for anyone to have coached her on what to say.

9. I personally interviewed . . ., [the victim's] four year-old brother. There were no indications that anyone had coached him or otherwise inappropriately attempted to influence him.

10. I personally interviewed the adult witnesses, and clearly explained to them that they were to testify only to those things about which they had personal knowledge, and not about anything they might have heard from other sources. Based upon my conversations with the adult witnesses, I believed that they were recounting their personal experiences.

11. Based on my independent investigation, I concluded the photo lineups and the live lineups were not misleading or suggestive. I further concluded that the testimony of the witnesses was of their own recall, and not the result of influence by police officers.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 27, 2006, in Los Angeles, California.

SIGNED
Ken Lamb, Declarant

The prosecutor's assertions that he personally made the decision to approve and to file a felony complaint against McSherry and to prosecute the case, and that he did so based solely upon his own independent investigation, were closely tested by McSherry's counsel in lengthy depositions. We have scoured this record to uncover any facts or valid inferences uncovered in those depositions or elsewhere that materially undermine the credibility of Lamb's assertions as to the independence of his judgment and have found none. It is not enough to demonstrate a genuine issue of material fact simply to say, as McSherry has, "McSherry disputes Defendants' factual premise that Lamb used independent judgment." Summary judgment requires facts, not simply unsupported denials or rank speculation. *Poppell*, 149 F.3d at 954. McSherry's statement of genuine issues in opposition to Defendants' motion for summary judgment does no better. At most, the facts relied upon by McSherry take issue with the thoroughness of Lamb's investigation, not the convincing evidence that it was entirely independent. Because this appeal is about the facts in the record, we array them in detail greater than our ordinary practice.

For example, McSherry's counsel asked Lamb, "[t]he circumstances of the original identification by [the victim] . . . as far as you know are based on what Turley said; isn't that right?" Lamb's answer was, "No, I interviewed [the victim] herself. I personally interviewed her." Later, McSherry's counsel pressed the same point, asking Lamb, "So what you know about that identification [of McSherry] is what has been related to you by Mr. Turley; correct?" Answer, "No, that's not correct. I also know what's been related to me [by the victim]."

Lamb elaborated about the victim's initial identification of McSherry in great detail:

> Q (by counsel for McSherry) And what was it that [the victim] said to you?

A (by Ken Lamb) Throughout various interviews?

Q What do you remember about what she said to you?

A That she referred to the individual who did these acts as "the stranger." She was unable to recall sexual — a great deal about the sexual acts themselves. She remembers going to a house, that in the bedroom there was a photograph of the stranger on the wall, that she was dropped off and went up to some other house, that — I think that would be her initial sort of description about what happened.

Q Okay. Anything else that you remember?

A At some point we talked about the photographic identification. Do you want me to go into that?

Q Yeah.

A Okay, I at some point — I don't recall when — I explained to her that she's not in any trouble, that no matter what she says, none of this is her fault. Kids frequently think that somehow when they get abused, when they get sexually assaulted, that they did something wrong, that it's their fault. I told her you didn't do anything wrong, it's not your fault. I told her that whatever she said, that as long as it was the truth, it didn't matter, she wasn't going to get into any trouble.

We would have had some conversation about — to make sure that she understood what it meant to tell the truth. In my mind — she was a child. When I interview kids, I rate them on a one to ten scale. On their ability to communicate her biggest problem was that she could communicate about portions of

things that had happened, but there were areas that she was totally blank on. The best example I can give of that is what I did in closing argument was I broke up a record album. You might be young enough that you don't know a record album, but I broke it and I held up pieces. She was — it was like trying to put a record album back together. There were pieces that you could hear, but then there would be spots missing. She came across in that way.

She was afraid. I told her that nothing was going to happen to her, that if she didn't remember something, it was okay. There were no wrong answers. We talked about — I tried to get some information about the stranger. She was really not very able to give information other than stranger. I asked her if she had seen photographs of which she said and that the stranger was one of them. I told her if she was guessing, that she didn't have to guess. If there was nobody there, she could say that. There was no wrong answers.

And she told me that she identified the stranger, that he was in a photographic line-up, that his picture had been on the wall in the house. I think that's the extent of how the conversations would have gone. I don't believe that they got — as we progressed through the conversations up to the trial, I don't believe that they got much more in detail things.

* * *

Q When you had a conversation with her about what it meant to tell the truth, what did you say to her?

A I asked here if she understood that it was important that she tell the truth. She said yes, and I

said — I held up a pen or something and I said if this was a yellow pen and it was a black one (sic), would that be the truth, and she said no, and I'm giving that example. That's not the — I'm not citing word for word. I'm doing some sort of description like that, some item. If I said it was a black pen it would be the truth; yes. I said what do you think would happen if you told me that it was not the truth, like the black pen was yellow when it really wasn't. She said she would be in trouble, and I said do you understand that if people tell you what to say, it doesn't matter, tell the truth. If someone else has told you what to say in the past — one of the tests that I use — and again, I don't want to mislead you. This is general things that I do. I can't give you specific word for word of what happened.

I give kids the example after they're done talking — I let them talk. I try not to give them suggestions or say things to them. At some point I will then say, well, what if your mother told me that, an example, that you were in a bathtub and these things happened to you. When kids tell me, oh, yeah, I remember that, I'll go into that conversation with them. That's not good. That tells me that they're very easily influenced and that they're probably not going to be a very good witness. Other kids who are on the other end and say if mom told you that, she's wrong, that's not what happened, I know that they're going to be a good witness, and we had conversations to that type of extent because in my mind it's important kids understand they're not going to be in trouble, and that they don't — there's no one they have to please I guess is the best way to put it.

\* \* \*

A She was without any hesitation that the stranger was in fact the person that she identified

which I knew to be, now know to be, McSherry. She was without any hesitation about the description of the room. She was very — had extreme difficulties in discussing the sex aspects of the crime. Those are the areas that I know.

The victim herself corroborated in her deposition the officers' and Lamb's recitations of her multiple positive identifications of McSherry.

Q (by counsel for the Defense) Were you told that you didn't have to pick out anybody if the person wasn't there?

A (the victim) Yes.

Q Were you then shown the photographs?

A Yes.

Q Did you pick out somebody?

A Yes.

Q Okay. Now, as to that somebody, did you ultimately pick that somebody out of the live line-up?

A Yes.

Q And did you ultimately identify that same somebody in a courtroom at a trial in Long Beach?

A Yes.

Q Who was that somebody?

A Mr. McSherry.

Q And is that the person that you picked out on your own when you were first shown the photographs?

A Yes.

Q And was that the same person you identified in the courtroom?

A Yes.

Q And were you being honest at the time on all three occasions?

A At the time, yeah.

Q When you picked out the photograph of McSherry, did you honestly believe it was McSherry who had done this to you?

A Can you say that again.

Q Yeah. When you first picked out the picture of McSherry at a hospital, did you believe at that time McSherry was the individual who had done this to you?

[objection by counsel]

A Yes.

Q Your answer is yes?

A Yes.

Q When you told them at the live line-up whether it was in the room or just outside the room that it was McSherry, was that a truthful statement?

[objection by counsel]

A Yes.

Q Yes?

A Yes.

Q And when you identified him in court, was that a truthful statement?

A Yes.

Q And the "him" you identified in court was who?

A McSherry.

As for Lamb's acceptance at face value of the police reports, he said this:

> Q (by counsel for McSherry) And the evidence that you have is the evidence that's given to you by the police officers in the case; correct?

> A (by Ken Lamb) No, because I interview witnesses. It's coming directly from the witnesses.

* * *

McSherry's counsel probed Lamb during his deposition for evidence of bias against a suspect in a sexual assault case. He found none.

> Q (by counsel for McSherry) And is the ultimate goal to obtain a conviction within those parameters?

> A (by Ken Lamb) No.

Q What is the ultimate goal?

A Is to examine the evidence in a fair and equitable manner. It's no — it's just as good if somebody who is accused of a crime you determine isn't guilty than it is that if you have the evidence and you convict somebody. I don't believe a prosecutor or deputy district attorney's role is ever as if it's a game and you have to win. You win — if it turns out somebody is innocent, you win. If it turns out somebody is guilty, then that's an appropriate win, too.

Q That's a pretty good job, you win no matter what.

A That's why I like it.

We also find it noteworthy that McSherry was offered a DNA test by the prosecution before trial, and he declined, preferring instead to go to trial without delay. Lamb testified that he was willing to waive time to allow the DNA test to be performed, but that McSherry was not.

At the core of McSherry's substantive constitutional claims as well as his rejoinder to the issue of causation is the assertion that the officers' allegedly improper conduct materially influenced the prosecutor's decision to file charges against him and to pursue a conviction. In this regard, McSherry relies in large measure on (1) a discrepancy between the victim's initial description of her attacker and McSherry, (2) allegedly flawed identification procedures used by Turley, and (3) what Turley said about the victim's incriminating description of the interior of the house where she was assaulted, which was at odds with the facts as well as denied by the victim 14 years later. McSherry argues specifically that "Lamb's 'independent investigation' was tainted by Defendant's fabricated evidence and unconstitutionally suggestive interview procedures and techniques." This, of course, could

be a valid claim — if McSherry had facts to back it up. *See Borunda v. Richmond*, 885 F.2d 1384, 1390 (9th Cir. 1988); *Barlow v. Ground*, 943 F.2d 1132, 1136-1137 (9th Cir. 1991).

We recognize that McSherry presented evidence to support one of his contentions, notably that one of the police officers may have fabricated evidence against him. In support of that claim, McSherry pointed in particular to the description of the interior of his grandparents' residence and argues that: 1) he provided Turley a detailed description of his grandparents' house after he was arrested; 2) Turley interviewed the victim the next day, then later documented in his police report and also testified at trial that the victim provided a detailed description of the interior of the residence during that interview; 3) the victim's detailed description differed from her initial description but matched the grandparents' residence; 4) after Turley searched the house, he reported that the victim provided another description with more matching details; 5) albeit fourteen years after she was kidnaped, the victim denied giving the descriptions that Turley documented and testified to; and 6) because McSherry was exonerated of the crimes and another party confessed, the victim obviously was never in the residence and could not have provided such a detailed description.

**[10]** But McSherry's presentation fell short and failed to raise a genuine issue of material fact as to whether the alleged fabrication or any misconduct by Defendants caused his arrest, prosecution, and conviction. As described above, there was probable cause to justify McSherry's arrest and prosecution. In addition, even examining the evidence in the light most favorable to McSherry, the evidence presented before the district court was simply insufficient to sustain a finding that Lamb's investigation and decision making was not independent and was tainted by the alleged fabrication of evidence. Again, we refer to Lamb's lengthy deposition where he was repeatedly challenged on these issues.

Q (by counsel for McSherry) Do you remember anything else other than what you've told us about your independent conversation with [the victim]?

A (by Ken Lamb) I may have mentioned it already, I don't know, but my telling her it was important to tell the truth. Part of the interviewing of her was to evaluate whether or not she was a competent witness and could actually communicate and testify, so I was looking for that, and the only other thing would be looking to see other things that she was saying that were issues that I call red flags I would have had to address or deal with.

Q Do you remember anything else?

A No.

Q You stated here, "The evidence is reviewed to ensure that there is not a bias or unfair inference placed upon witnesses." What do you mean by that?

A When I'm looking at a case, I'm trying to do a couple of things. Obviously if there's evidence that shows that somebody didn't commit the crime, I don't want that evidence to be ignored, and second, I need to make sure that we have evidence that will stand up in court, a jury will hear it and say, yes, beyond a reasonable doubt I believe this person committed this crime. In order to do that I try to think and look for things that a defense attorney representing somebody will argue. Whether they're, one, meritorious or have any value doesn't mean, with all respect to the defense attorneys, that they're not going to still argue it, so if there's something that even if it's not there — example, if a police officer says I saw this person drop a gun, there may be no evidence that that officer is lying, but the defense is

going to argue how can you trust the police officer's testimony, so you have to be alert for those things, and in evaluating a case I'm looking to see if there's any indications or evidence that a defense attorney is going to raise questions about. *In this case there was a huge red flag immediately, and that was how Mr. McSherry's photograph was identified.*

Q When you say "The evidence is reviewed," are you saying that this is what you did with respect to Mr. McSherry's case?

A Correct.

Q And when you say, "The evidence is reviewed," what evidence are you talking about? Are you talking about the police reports that are presented to you by the police department?

A No, I'm talking about all of the — let's make sure we're talking about a time frame here. Back then I'm talking about statements by witnesses, physical evidence that you have, statements by police officers, any evidence that's going to be presented in court.

Q And when you look at this evidence are you looking at the formal police reports, are you looking at the officers' notes, what are you looking at?

A I'm looking at whatever I have which would be police reports, statements of witnesses, interviews with witnesses or victims, physical evidence, testing of physical evidence and results of that, whatever evidence I have that could find its way into court.

Q *And the evidence that you have is the evidence that's given to you by the police investigators in the case; correct?*

A *No, because when I interview witnesses, it's coming directly from the witnesses.*

Q Other than your own independent investigation?

A No, because it could come from crime lab people, not police officers.

Q Other than that? Whatever investigations the police officers have done and they present it to you —

A Right.

Q — do you independently search for any documents relating to that investigation that they've done, or do you rely on the documents that they give to you?

A I'm sorry, I don't understand the distinction you're trying to make.

Q Okay. Let's say I'm an investigator on [this] case.

A Right.

Q And I go to you and I say here, Mr. Lamb, I want the charges filed and here are the reports on this case, and I give you the reports in this case. You then review those reports and you make a determination. Do you then say, well, do you have anything else in connection with this case, do you have any notes, do you have any other reports, do you have something else that you haven't given me?

A Yes, and frequently —

Q Did you do that in this case?

A Yes, and frequently direct them to do other things.

Q And were you given what to your satisfaction was all the reports that they had in connection with the McSherry case?

A Yes.

Q Were you given all their handwritten notes to your satisfaction?

A At some point, yes.

Q And did you review all those?

A Yes.

Q Now you say here, "The photo line-ups and live line-ups were not misleading or suggestive." What photo line-ups are you talking about?

A The photo that I refer to as the six-pack of McSherry.

Q Any other photo line-ups?

A There were — I believe there were some photo line-ups of the vehicle, and possibly — well, I'm not positive there were any of the house. I think it was just the vehicle.

Q And what did you do to determine that the photo — let's talk about them in terms of show-ups — that the photo show-ups of the individuals were not suggestive?

A  I looked at the photo line-ups.

Q  And?

A  They weren't suggestive.

Q  And what criteria did you use to determine that they weren't suggestive?

A  Well, for example, if you're trying to identify or eliminate an African-American and you put his photo in with five male Caucasians, that's the argument and there's a distinction here again. Now we're talking about what will happen in a trial versus the reality aspect. The argument is that's going to be highly suggestive. I'm not commenting on whether that's true or not true, but that's the argument.

Q  I'm sorry to interrupt you. Maybe you didn't understand my question. My question is not a general question. My question is with respect to the six-pack in this case, in the McSherry case, what criteria did you use to determine that that six-pack was not suggestive?

A  That's what I'm explaining. I looked at the photographs and made sure that if you were showing somebody these photographs without any knowledge of who they were supposed to be looking for, would anybody be picking a specific photograph for whatever reasons. Did the officers tell me or write anything that suggested in any way that the photographic line-up could be questioned. For example, if someone showed me your photograph by itself and they said is this the person who was asking you questions in the deposition, well, the answer would be yes, but there still could be the argument of, see, that was suggestive because they only showed one

photograph. Doesn't change that it's actually the truth, but that argument could exist, so that's what I mean by looking at the photographs and determining that.

Q But that didn't exist in this case because there were six photographs.

A Correct.

Q So we're not dealing with a single photograph being shown.

A I understand.

Q What was it about this particular six-pack that lead you to believe that it was not suggestive in any way?

A I didn't see — if you didn't know that McSherry was involved in a case, I didn't see any photographs that if you showed it to general people the consensus would be they would be picking the same photograph because something stood out in that photograph, nor did I have any information to lead me to believe that contrary to — let's assume you get past that stage, that the photographs are okay, that something else was occurring that made people pick the same photograph.

Q What was the description that the witnesses gave of the individual who had kidnapped [the victim]?

A I don't know exactly. I am aware that it was not fitting of McSherry.

Q *In your conversations with [the victim], were you aware of the description that she had given of the individual?*

A *Yes.*

Q *And were you aware that it didn't fit Mr. McSherry?*

A *Yes.*

Q And did you talk to [the victim] about the difference between that description and her identification of Mr. McSherry?

A I wouldn't say it that way because it would be too suggestive. I would say it more on when you looked at the photographs, are you certain that the person you picked was the stranger.

Q My question was did you talk to [the victim] at all about her initial description of the individual?

A No.

[Break in the deposition]

Q Mr. Lamb, we were talking before the lunch break about Exhibit 1022 which is your Rule 26 report, and in there you state if you look at the paragraph that says "Information relied upon by the Expert," the last sentence you say, "The testimony of witnesses was cross-checked with other information to ensure that there was corroboration." What other information are you referring to?

A Witnesses corroborate other witnesses, events that were corroborated by — for example, [the vic-

tim's] description of the house. There was a house that had a room with that description. Things like that.

Q Anything else that you mean by that?

A Other than evidence corroborating evidence and witnesses, no.

Q When you say "corroboration," are you talking about whether the testimony of the witnesses corroborated each other?

A Sure, that's one way of corroboration.

Q What other — other than that, other than testimony corroborating, what other aspects of corroboration did you mean to include with the word "information"?

A When [the victim's] description of a room where these events took place meets a description of a room that's found that fits that description, that's corroboration of her testimony.

Q Did you ever talk to [the victim] about the original description that she had given about the place where she had been taken and raped?

A No. What I would ask her is what can you tell me about the place. Now if that's asking her about her original description, that would be, I guess, a yes, but I wouldn't tell her details, if that's what you're asking. I'm not sure.

Q *Well, you were aware that she had originally given a description of the place to where she had been taken; correct?*

A *Correct.*

Q *You were aware of that description; correct?*

A *Correct.*

Q Did you ever ask her anything about that original description that she gave?

A If there were issues that were contradictory, I may have very well asked her about it without giving her — letting her give me the information first, and then saying could it have been this or this instead, or do you recall saying something like this to somebody else.

Q *Did you feel that there were any, as you say, issues that were contradictory?*

A *Yes, I believe there were description contradictions, but not that she was giving to me, if that's what you're asking.*

Q Well, I'm not sure I understand your question. You say that you believe that there were description contradictions?

A *I believe that from the initial reports the description of the suspect and the description of the location would be somewhat contradictory to what she was now telling me.*

Q And my question is did you attempt to resolve those contradictions by asking her questions concerning the contradictions?

A Yes.

Q And what did you ask her?

A I don't recall.

Q *How were the contradictions resolved in your own mind?*

A *From talking to [the victim], the information that she was telling me I believed over things that were in the reports.*

Q Are you saying you did not believe that she had originally given the description contained in the reports?

A No, I'm saying that whether she gave them then or didn't give them, I didn't believe that they were accurate.

Q Why?

A Because I'm talking to [the victim] and she's telling me information.

Q Any other reason other than that?

A Well, the information that she's telling me is then corroborated by other information.

Q Which is what?

A Robin Davis, her brother, the location, the description of the location.

*  . .

Q Did you personally attempt to establish the veracity or credibility of any of the reports that were prepared by police officers?

A Yes.

Q How did you do that?

A By personally interviewing the witnesses myself.

Q In interviewing the witnesses yourself was your purpose to try to determine the veracity of the police reports?

A I would phrase it differently because it seems to imply that I had some question about the veracity. I had nothing that lead me to believe that there was a problem other than I had to focus on the photo line-up because of how — the uniqueness of it, because of the way the person was selected, being a filler, not having a reason why he was in the line-up, but I would have been examining those areas so that they would not have been trial issue areas.

Q When you say "so that they would not have been trial issue areas," what do you mean?

A Well, I want to make sure that when a witness is on the stand and I say thinking back to that day and that time and looking at the defendant here, are you absolutely certain it's that defendant, that their answer is yes and that they weren't influenced by anybody to say yes, and that on the stand they're not going to be telling me things that I should have known before they were testifying. ‡. .

(emphases added).

[11] Against this record, McSherry has put forward insufficient facts and evidence to proceed past summary judgment. The record is devoid of any information, facts, or valid infer-

ences that might undermine the prosecutor's testimony. In fact, the evidence — including the victim's continuing affirmation of her identification of McSherry as her attacker — supports Lamb's deposition testimony. Accordingly, this case is particularly distinguishable from *Borunda* and *Barlow* where the prosecutors relied only on police reports in making their decision to file charges. *See Borunda*, 885 F.2d at 1390; *Barlow*, 943 F.2d at 1136-37. In the words of *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252, this case is manifestly so "one-sided" that it need not be submitted to a jury.

McSherry argues also that Turley is liable for his allegedly false trial testimony regarding the descriptions of the interior of the residence. This claim is foreclosed by *Briscoe v. LaHue*, 460 U.S. 325, 326 (1983) (holding that police officers are immune from liability under 42 U.S.C. § 1983 for perjured testimony).[2]

### 3. *Monell claims*

**[12]** Because McSherry has no case against the officers, and because he tenders no facts other than their alleged personal misdeeds as evidence of a policy statement, ordinance, regulation, decision, custom, usage, or practice of either the City of Long Beach or the Long Beach Police Department that caused his injury, *see Poppell*, 149 F.3d at 970-71, his *Monell* claim also fails as a matter of law. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (per curiam) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations

---

[2]McSherry relies on *Harris v. Roderick*, 126 F.3d 1189, 1198-99 (9th Cir. 1997) for the proposition that Turley is not entitled to immunity because he initiated the prosecution. We do not find this argument persuasive. *Harris* holds that if officers "functionally served as complaining witnesses who may be said to have initiated [the] prosecution they are not entitled to absolute immunity for their false statements." *Id.* In *Harris*, unlike the case at bar, there were no other complaining witnesses, only the officers. Here, the victim served as the complaining witness.

might have *authorized* the use of constitutionally excessive force is quite beside the point."); *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994) ("While the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights."); *Jackson v. City of Bremerton*, 268 F.3d 646, 653-654 (9th Cir. 2001) ("Neither a municipality nor a supervisor . . . can be held liable under § 1983 where no injury or constitutional violation has occurred."). This case is distinguishable from cases such as *Chew v. Gates*, 27 F.3d 1432, 1444 (9th Cir. 1994), where the City of Los Angeles maintained an explicit policy involving the use of biting police dogs, one of which allegedly inflicted excessive force upon the plaintiff.

**AFFIRMED**.